### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### ROCKWOOD ENERGY AND MINERAL CORPORATION, Rockwood Holding Company and Harmony Mining Company, Respondents.

#### No. 91–3046.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) July 24, 1991.

Decided Aug. 2, 1991.

---

Charles Donnelly, Paul Hitterman, Jerry M. Hunter, D. Randall Frye, Aileen A. Armstrong, N.L.R.B., Washington, D.C., for petitioner.

Mark R. Hornak, Margaret J. Bozik, Buchanan Ingersoll Professional Corp., Pittsburgh, Pa., for respondents.

Robert H. Stropp, Jr., Michael Dinnerstein, United Mine Workers of America, Washington, D.C., for amicus curiae United Mine Workers of America.

Before SLOVITER, Chief Judge, GREENBERG, Circuit Judge, and McCLURE, District Judge *.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

The National Labor Relations Board (Board) petitions this court for enforcement of its decision and order of September 27, 1990 finding that respondents, Rockwood Energy and Mineral Corporation, Harmony Mining Company (Company), and Rockwood Holding Company, violated sections 8(a)(5) and (1) of the National Labor Relations Act (NLRA) in January 1987 when the coal mine at issue resumed production by failing to recall laid-off employees, unilaterally changing the terms and conditions of employment, and refusing to recognize and bargain with the relevant union.

### I.

Harmony Mining Company operates a coal mine in Portage, Pennsylvania, and during the period in question it recognized the United Mine Workers of America (Union) as the collective-bargaining representative of its employees. In 1981, Harmony entered into a collective bargaining agreement with the Union effective through September 1984. Article XVII section (d) of

---

* Hon. James F. McClure, Jr., United States District Court for the Middle District of Pennsylvania, sitting by designation.

the contract, which was the National Bituminous Coal and Wage Agreement of 1981, provided that "[e]mployees who are idle because of a reduction in the working force shall be placed on a panel from which they shall be returned to employment on the basis of seniority...." App. at 308.

In May 1982, Harmony suspended production at the Portage mine and temporarily laid off 40 unit employees for economic reasons. In September 1982, the employees completed "panel forms" in accordance with the collective bargaining agreement. The Union held monthly meetings, which were attended by eight to ten people. While the mine was idle, Harmony employed a skeleton crew to maintain the mine equipment and mine safety; the crew consisted of mine superintendent Paul McVicker, foreman George Leturgey, and unit employee Ronald Geisbrecht, whose return to work resulted from an arbitration initiated by the Union.

At the time of the layoffs, the Harmony corporation was owned by Warren Hinks and Mike Cimba. In 1983, the ownership of Harmony changed when Rockwood Energy and Mineral Corporation (REMCO), Harmony's major creditor, acquired all of Harmony's assets and shares of stock. REMCO assigned its shares to RHC, its parent company. Hinks and Cimba transferred their stock certificates directly to RHC, resigned as directors and officers of Harmony, and were replaced by new directors and officers who were also directors and officers of REMCO and RHC.

Although Harmony continued to exist as a corporation after the change in ownership, its financial affairs were integrated with REMCO and other RHC subsidiaries. Funds were transferred from REMCO to Harmony to maintain Harmony's payroll and other expenses. After 1984, RHC filed consolidated tax returns for Harmony and its other subsidiaries. Alan Miller, assistant to the treasurer of RHC and REMCO, became Harmony's President in 1984. Superintendent McVicker and foreman Leturgey were on REMCO's payroll and REMCO's pension plan, while unit employee Geisbrecht was kept on a separate payroll and

received pay and benefits in accordance with the union contract. Union dues were deducted from Geisbrecht's salary, and contractually required pension payments for him were made to the UMW pension trust until 1985.

In 1984, the Union and the Company met to begin negotiations for a collective-bargaining agreement to succeed the contract which expired that year. Before an agreement was reached, Harmony informed the Union that it had decided to sublease its mining facility rather than mine the coal itself. The Union complained that the Company had bargained in bad faith, but the Board chose not to issue a complaint against Harmony.

In 1985, Harmony began to change the conditions of Geisbrecht's terms of employment; it stopped deducting his union dues and ceased making pension payments. In 1986, Harmony reduced his wages, sick days and vacation time. The Union was informed of the unilateral action, but took no action.

In 1986, Harmony hired Tracy McVicker, the superintendent's son, to assist in the retreat from portions of the mine. The work performed by Tracy was unit work.

In January 1987, the mine resumed production after hiring two more employees, Paul McVicker and Jeff Kerch. Kerch had previously been a member of the Union. Four laid-off union members inquired about jobs and were told that Harmony was not accepting applications. The Union contacted Harmony's attorney and asserted that it was the collective bargaining representative of Harmony employees and requested bargaining. In March 1987, the Union filed an unfair labor practice charge with the Board.

The Administrative Law Judge (ALJ) dismissed the complaint. Although he characterized the 1983 transaction as a stock transfer, the ALJ found that there was "no basis for presuming that the Union has continued its representative status after [the] extensive hiatus." App. at 587.

The Board disagreed with the ALJ. It found that Harmony, REMCO and RHC were a single employer, that RHC assumed

control over Harmony through a stock purchase, and that "because the stock transfer occurred during the life of the collective bargaining agreement ... Harmony, REMCO and RHC, as a single employer ... [were] obligated, after the expiration of the contract, to maintain the terms and conditions of employment it established" without unilateral change. *Rockwood Energy Corp.*, 299 NLRB No. 162, 135 LRRM 1282, 1286 (1990). Alternatively, the Board found REMCO and RHC to be a successor employer to Harmony, and found that REMCO and RHC adopted the collective bargaining agreement by their conduct.

The Board ordered the Company to cease and desist from: 1) refusing to recognize and bargain with the Union; 2) changing the terms and conditions of employment established by the collective bargaining agreement; 3) failing to recall laid-off employees in accordance with the collective bargaining agreement; and 4) restricting or coercing employees in the exercise of their section 7 rights. The Board ordered respondents to, *inter alia*, "[r]estore [the] terms and conditions of employment that the Respondent unilaterally changed in January 1987 and make whole employees for any losses they may have suffered as a result of the unilateral changes...." App. at 570.

## II.

As a general matter, it is the Board's order, not the ALJ's conclusions, that we review and we must uphold the Board's order unless we conclude that its findings are not supported by substantial evidence. *NLRB v. Alan Motor Lines Inc.*, 937 F.2d 887, 890–91 (3d Cir.1991). The respondents agree that the testimony and evidence presented was in the main uncontested. Thus, this is not a case where the ALJ's credibility findings played a role in the Board's determination. *Cf. Id.* at 891 (board may not reject ALJ's credibility findings unless shown to be incorrect by clear preponderance of evidence).

■ An employer has a duty to recognize a bargaining representative that has demonstrated its majority support. A union's majority status is irrebuttably presumed during the term of a collective bargaining agreement, *see NLRB v. Local 103, International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 343 n. 8, 98 S.Ct. 651, 656 n. 8, 54 L.Ed.2d 586 (1978); after a collective bargaining agreement expires, the presumption of majority support may be rebutted by objective evidence which establishes the loss of majority support. *See Hajoca Corp. v. NLRB*, 872 F.2d 1169, 1173 (3d Cir.1989).

The Board's conclusion that respondents were obligated to bargain with the Union and adhere to the terms of the labor agreement despite Harmony's change of ownership in 1983 and the expiration of the collective bargaining agreement in 1984 was based on two findings. First, it determined that RHC and REMCO gained control of Harmony through a stock transfer and thus that the employer that reopened the mine in 1987 was the same legal entity that closed the mine in 1983. Second, it determined that RHC, REMCO and Harmony were a single employer, and that, as a result, Harmony's labor obligations could be imputed to RHC and REMCO.

■ A stock sale does not absolve a corporate entity from labor obligations which accrued prior to the sale. *See Esmark, Inc. v. NLRB*, 887 F.2d 739, 751 (7th Cir. 1989); *TKB International Corp.*, 240 N.L.R.B. 1082, 1083 n. 4 (1979) (stock transfer "involves no break or hiatus between two legal entities, but is, rather, the continuing existence of a legal entity, albeit under new ownership").

■ The Board's finding that the 1983 change in ownership constituted a stock transfer is supported by substantial evidence. RHC acquired its Harmony stock from Hinks and Cimba. REMCO purchased Harmony's assets and assigned them to RHC, its parent. As the Board noted, "RHC preserved Harmony's status as a corporation and as an employing entity; RHC continued Harmony's mining operation with the same superintendent; and RHC continued to do business under the

Harmony name." App. at 563. Thus, the employer that refused to bargain with the Union in 1987 was a continuation of the employer that entered into the collective bargaining agreement in 1981.

■ In determining whether separate entities constitute a single employer the Board considers four factors: interrelation of operations, common management, centralized control of labor relations, and common ownership. *See NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam). Although no single factor is controlling, the Board has stressed the first three factors, particularly centralized control of labor relations. *Al Bryant, Inc.*, 711 F.2d at 551.

As to common management, Alan Miller, the assistant to the secretary of RHC, became president of Harmony. McVicker, the Harmony mine superintendent, reported to Miller who in turn reported to the treasurer of RHC. All of Harmony's significant purchases were authorized by the President of RHC.

Control of Harmony's labor relations was centralized under the treasurer of RHC and his assistant, Alan Miller, who served as Harmony's President. Miller and the treasurer decided to transfer Harmony's non-union employees to REMCO's benefit plan, and they authorized the hiring of non-union employees for the retreat. During the 1984 negotiations for a new collective bargaining agreement, Miller informed the Union that he represented the Rockwood Company.

The integration of the operations of RHC, REMCO and Harmony is evidenced by the facts that REMCO and RHC assumed Harmony's payroll, and that revenues from the Harmony mine were received by REMCO, which transferred money to Harmony as it was needed. Finally, the record supports the Board's finding that the companies were commonly owned: RHC, the parent company, wholly owned Rockwood Insurance Company, which owned REMCO, which in turn owned Harmony's stock.

■ Respondents do not directly challenge the Board's findings regarding single employer status and stock transfer. They argue instead that their labor obligations should have been determined under the successorship doctrine, which is used to determine obligations where one corporate entity is replaced by another. However, the concept of "successorship," unlike that of the single employer, contemplates "the substitution of one employer for another, where the predecessor employer either terminates its existence or otherwise ceases to have any relationship to the ongoing operations of the successor employer." *TKB Int'l Corp.*, 240 N.L.R.B. at 1083 n. 4. In contrast to a stock transfer, where a continuing employer remains bound by its collective bargaining agreement, a successor is not bound by the substantive terms of its predecessor's labor agreement, although it does have an obligation to bargain with the union that was recognized by its predecessor if there is "substantial continuity" between the two employers' workforce and industry. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40–41, 107 S.Ct. 2225, 2234–2235, 96 L.Ed.2d 22 (1987). Respondents contend that the Board ignored its own precedent by not utilizing successor analysis which focuses on continuity of workforce.

We have in the past declined to decide whether, as a general rule, the successorship analysis applies where there has been a sale of all of a corporation's stock to a new entity, but the corporate entity itself remains in existence. *See District 1199P, National Union of Hosp. & Health Care Employees v. NLRB*, 864 F.2d 1096, 1103, n. 5 (3d Cir.1989) (reserving the issue). The ranks of those courts holding that the successorship doctrine is inapplicable in that situation have been swelled by the addition of the Seventh Circuit. *See Esmark*, 887 F.2d at 751 ("[t]he successorship doctrine is simply inapplicable to a stock sale transaction"); *See also EPE, Inc. v. NLRB*, 845 F.2d 483, 489 (4th Cir.1988)

(refusing to apply successorship analysis to absolve a corporation of contractual obligations where stock was sold to a third party and company remained an independent corporation; operations at the plant were essentially unaffected by the transfer, and there was no termination of operations or employees at the plant). *But see United Food and Commercial Workers International Union, Local 152 v. NLRB*, 768 F.2d 1463, 1471 (D.C.Cir.1985) (applying successorship doctrine where "the events at issue ... plainly involved a broader form of business reorganization, and not a mere stock transfer").

Even if we believed successorship analysis was appropriate in some stock transfer situations, this would not be such a case because the enterprise did not change substantially as a result of the transfer of stock. As the court stated in *Esmark*, where a stock transfer does not result in a substantially different enterprise, "[t]he successorship doctrine is simply inapplicable to a stock sale transaction." 887 F.2d at 751; *see also Sterling Processing Corp.*, 291 N.L.R.B. 208, 210 n. 10 (1988) (no merit to the contention that bargaining obligations should be evaluated under the successorship doctrine where employer was the "same entity in ownership, corporate form, management, business, and production on reopening as it had been prior to the shutdown").

Respondents argue that the change in Harmony's ownership and the five year hiatus caused an "essential change" in Harmony's business sufficient to remove its duty to bargain with the Union. The Board, however, found continuity between the pre- and post-hiatus business. It noted the similarity of the jobs performed before and after the hiatus, and that the mine continued to produce industrial coal when it reopened in 1987.

Whether a change in business affects an employer's labor obligations is measured by whether it "affected employee attitudes towards representation." *District 1199P*, 864 F.2d at 1104 (quoting *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 627 (9th Cir. 1983)). Significantly, in this case the Board found that the laid-off employees had a reasonable expectation of recall, and that they demonstrated their expectation of continued union representation by maintaining their names on layoff panels and attending union meetings, and through the Union's communications with the employees and management during the five year suspension of mining. This finding is supported by substantial evidence: during the production hiatus the mine and equipment were maintained; one unit employee continued to work and other unit members were in layoff status with the contractual right to be recalled.

Respondents contend that the five year hiatus is an important factor in assessing the employees' attitude toward union representation. The Board has held, however, that where the identity of the employer remains the same, the length of the hiatus does not rebut the presumption of majority status. *See Morton Dev. Corp.*, 135 LRRM 204, 1206–07 (1990); *see also Sterling Processing*, 291 N.L.R.B. at 210. Furthermore, the Board noted that although the Harmony mine produced no coal for five years, the mine and equipment were maintained during the suspension period, thus preserving the capacity of the mine to produce, and supporting the laid-off employees' expectation of recall. *Rockwood Energy Corp.*, 135 LRRM at 1286 n. 11.

Because the Board reasonably held that the post-hiatus employer was a continuation of the pre-hiatus employer, substantial continuity of the workforce, although essential to successorship analysis, is not an issue here. Even if relevant, in light of the other indicia of continuity (same product produced, same employer, same jobs) the fact that the workforce makeup has changed is not enough to rebut the presumption of majority support for the union.

■ Because Harmony, RHC and REMCO were a single employer, and the stock purchase occurred during the life of the old labor agreement, the Board did not err in finding that respondents violated the NLRA by not following the recall provisions of the labor agreement. An employer violates the NLRA by unilaterally

changing the terms and conditions of employment, even after the agreement has expired. *See International Ass'n of Bridge, Structural & Ornamental Iron Workers Local 3 v. NLRB,* 843 F.2d 770, 774 (3d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 2528, 102 L.Ed.2d 213 (1988); *Electric Machinery Co. v. NLRB,* 653 F.2d 958, 964 (5th Cir.1981).

Respondents strenuously contend that this case is controlled by *Molded Fiber Glass Body Co.,* 182 N.L.R.B. 400 (1970), which held that an employer's refusal to bargain with a union after the reopening of its plant thirteen months after it closed did not violate sections 8(a)(5) and (1). The Board's conclusion in *Molded Fiber* that the union was not entitled to a presumption of continuing majority support was based on its factual findings that the plant closure was intended to be permanent, that the employees were terminated, and that they had no expectation of being recalled. Similarly, in *Sterling Processing Corp.,* (1988), relied on by respondents, the Board's conclusion that the employer was not obligated to bargain with the union before it modified preexisting wages and working conditions prior to reopening was based on its finding that the entire work force had been discharged and had "no reasonable expectation of being recalled." 291 N.L.R.B. at 210. In contrast to these two cases, the Board in this case found that despite the suspension of production in 1983, the employees had a continuing expectation of employment and, as we noted above, there is support for that finding. Thus the Board's decision not to apply the successorship doctrine in this case was not erroneous as a matter of law, and was supported by the evidence of record.

### III.

■■■■ Finally, respondents contend that the Board's order is incapable of being enforced both because it does not sufficiently identify which employees should be made whole and because the order attempts to remedy actions that took place outside of the six-month limitations period in section 10(b). The Board has ordered the employer to "[r]estore terms and conditions of employment that the Respondent unilaterally changed in January 1987 and make whole employees for any losses they may have suffered as a result of the unilateral changes in the manner set forth in the remedy section of the decision." Contrary to respondents' assertions, the order does not attempt to remedy action taken by respondent outside the limitations period.

The identity of the employees to be made whole and the amount of backpay does not, as respondents suggest, need to be specified in the Board's order. Remedial details such as the amount of compensation are often left to the compliance proceedings, *see International Bhd. of Elec. Workers, Local 211 v. NLRB,* 821 F.2d 206, 212 (3d Cir.1987), and there is no reason why the specific identity of the employees involved should not be similarly treated. The case on which respondents rely, *Systems Management, Inc. v. NLRB,* 901 F.2d 297 (3d Cir.1990), upheld a "make whole" Board order as it was applied to union employees who were not hired. Although this court declined to enforce the part of the order requiring payment of back wages for those employees who were hired instead of the wrongfully displaced union members, the holding was based on our finding that the Board lacked authority to make whole newly hired employees, rather than on the Board's failure to identify specific employees. Therefore we reject respondents' challenge to the form of the order.

### IV.

For the foregoing reasons we will enforce the order of the Board.