101 F.3d 108
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
HARTFORD HOSPITAL, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 95-4129, 95-4143.
 United States Court of Appeals, Second Circuit.
 March 14, 1996.
 
 APPEARING FOR PETITIONER: Brian Clemow, Shipman & Goodwin, Hartford, CT.
 APPEARING FOR RESPONDENT: Robert J. Englehart, National Labor Relations Board, Washington, DC.
 N.L.R.B.
 ORDER ENFORCED.
 Before LUMBARD, MINER and JACOBS, Circuit Judges.
 
 
 1
 UPON CONSIDERATION of this petition for review and cross-petition for enforcement of an order of the National Labor Relations Board, it is hereby
 
 
 2
 ORDERED, ADJUDGED, AND DECREED that the order be and it hereby is ENFORCED.
 
 
 3
 This cause came on to be heard on the transcript of record and was argued by counsel.
 
 
 4
 Petitioner Hartford Hospital (the "Hospital") petitions for review of a July 31, 1995 order of the National Labor Relations Board, the Board having found that the Hospital violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) and 158(a)(5). The Board cross-petitions for enforcement of that order.
 
 
 5
 On October 1, 1994, the Hospital, an acute care hospital, acquired the Institute of Living ("IOL"), a private psychiatric care hospital. Prior to the acquisition of IOL, the Hospital offered a wide range of services, including both medical and psychiatric care. IOL was located on a 34-acre campus across the street from the Hospital. IOL's campus consisted of several buildings, including locked psychiatric units and four transitional living facilities (the "group homes"). Two of the group homes are located off-campus. IOL provided a wide variety of in-patient and out-patient psychiatric services.
 
 
 6
 All of IOL's "technical employees" were represented by the New England Health Care Employees Union, District 1199, AFL-CIO (the "Union"). Immediately prior to the acquisition, there were approximately 90 employees in the bargaining unit (the "IOL unit"). The employees in the IOL unit worked in the Donnelly Building on the IOL campus, as well as in the four group homes. The most recent collective bargaining agreement between IOL and the Union expired on June 14, 1994, but IOL continued to honor the contract up until the acquisition.
 
 
 7
 On July 9, 1993, the Hospital and IOL executed a Memorandum of Understanding (the "MOU"), in which they agreed to combine their operations. The MOU envisioned IOL's continued existence as a corporate entity, although as a subsidiary of the Hospital. The MOU stated that "[t]he core of this proposal is to create a single, fully integrated mental health system of care under the auspices of [IOL], under the overall umbrella of Hartford Hospital." The MOU indicated that "[i]t is the unequivocal intent of both organizations that the identity, mission, and special focus of [IOL] will be maintained and enhanced under a new IOL."
 
 
 8
 By letter dated November 19, 1993, the Hospital informed the Union that the employees of the IOL unit would become employees of the Hospital. The Hospital explained that the employees in the IOL unit would "receive wages and benefits consistent with those applicable to other Hartford Hospital employees, and [would] work under the same conditions of employment."
 
 
 9
 After the acquisition, IOL continued to exist in its corporate form, but as a wholly-owned subsidiary of the Hospital. IOL retained its name, ownership of its land and buildings, board of directors, and ownership of its $20 million endowment. However, various aspects of IOL and the Hospital's operations were integrated.
 
 
 10
 Following the acquisition, the Hospital instituted a number of changes in the terms and conditions of employment of the employees in the IOL unit, without first notifying the Union. Thereafter, the Board issued an administrative complaint against the Hospital, alleging that it had violated the Act by changing the terms and conditions of employment for employees in the IOL unit without bargaining with the Union.
 
 
 11
 On May 5, 1995, an administrative law judge ("ALJ") determined that the Hospital had violated the Act. The ALJ found that the Hospital had assumed IOL's duty to bargain with the Union because the Hospital's acquisition of IOL was "akin to a stock transfer" and, alternatively, because the Hospital was a successor employer with a duty to bargain. In addition, the ALJ determined that the IOL unit continued to be an appropriate bargaining unit following the acquisition. Accordingly, the ALJ concluded that the Hospital had a legal obligation to recognize and to bargain with the Union, and that the Hospital had violated the Act by unilaterally changing the terms and conditions of employment. On July 31, 1995, the Board affirmed the ALJ's decision.
 
 
 12
 The Hospital claims that the Board erred in determining that the Hospital's acquisition of IOL was "akin to a stock transfer." We reject this claim. "[T]he Board has long held that a corporate entity remains liable after a stock sale for labor obligations which accrued prior to the sale." Esmark, Inc. v. NLRB, 887 F.2d 739, 751 (7th Cir.1989). Even if a stock transfer occurs after the expiration of a collective bargaining agreement, the new owner may be obligated not only to recognize the union, but also to maintain the unit employees' terms and conditions of employment. See NLRB v. Rockwood Energy and Mineral Corp., 942 F.2d 169, 175-76 (3d Cir.1991).
 
 
 13
 In Children's Hospital of San Francisco, 312 NLRB 920, 1993 WL 398480 (1993), the Board found that a merger of two acute care hospitals "was akin to that of a stock transfer." In Children's Hospital, two nearby but separate acute care hospitals merged to create a new legal entity with centralized management, common personnel, and common employee wages, benefits, and rules. The Board focused its inquiry on "whether operations, as they impinged upon bargaining unit members, remained essentially the same after the transfer of ownership." Id.
 
 
 14
 at * 11. The Board found that "there was no hiatus in operations, and, on the day following the merger, what was renamed as Respondent's California campus continued to operate as a separate full-service acute care medical facility in the same buildings as prior to the merger, utilizing the same equipment and offering the same services with the same personnel and immediate supervision." Id. The Board found that the transaction was nothing more than a "corporate name change" and thus that the newly created entity was obligated to recognize the union that existed prior to the merger.
 
 
 15
 We believe that the Board properly determined that the Hospital's acquisition of IOL was akin to a stock transfer, as in Children's Hospital. IOL, a psychiatric facility, became a wholly owned subsidiary of the Hospital, an acute care hospital. One of the purposes of the acquisition was the preservation and enhancement of IOL's "identity, mission, and special focus." After the acquisition, IOL continued as a separate corporation, retained full ownership of its real property and buildings, and retained sole control over its endowment. Moreover, there was no hiatus in operations following the acquisition. The Board found that the employees of the IOL unit continued to perform their jobs, delivering "the same services in the same facilities and with the same immediate supervision." Therefore, we think that the Board properly concluded that, because the Hospital's acquisition of IOL was akin to a stock transfer, the Hospital had an obligation to recognize and bargain with the Union.[1]
 
 
 16
 The Hospital also contends that the Board erred in determining that the IOL unit remained an appropriate bargaining unit following the acquisition. The Board's determination that a bargaining unit remains appropriate "can be set aside only if arbitrary, unreasonable, or not supported by substantial evidence." Trustees of Masonic Hall & Asylum Fund v. NLRB, 699 F.2d 626, 632 (2d Cir.1983). This determination involves "a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491 (1947). We think that there was an adequate basis for the Board's determination that the IOL unit remained an appropriate bargaining unit.
 
 
 17
 First, we believe that the Board properly determined that the single facility presumption applied in this case. Under the single facility presumption, a bargaining unit consisting of employees working in a facility that is separated from other facilities and operated by the same employer is presumptively appropriate. See Staten Island Univ. Hosp. v. NLRB, 24 F.3d 450, 456 (2d Cir.1994). In the present case, there is substantial evidence supporting the Board's finding that the IOL campus is a single facility. Both before and after the acquisition, IOL was a separate psychiatric facility. Six months after the acquisition, the Hospital moved its psychiatric unit to the Donnelly building on the IOL campus. However, all of the functions performed by IOL continued to be performed in the Donnelly buildings on the IOL campus. Indeed, the Board found that IOL continued to have a "separate identity from the rest of Hartford Hospital, an identity separate physically, by function, and by the skills of its unit employees."
 
 
 18
 In addition, we think that the traditional "community of interests" factors indicate that the IOL unit remains an appropriate bargaining unit following the acquisition. See id. at 455-56. First, the IOL unit has enjoyed a 14-year bargaining history with IOL. In addition, there was little employee interchange between the technical employees in the IOL unit and the technical employees at the Hospital. Since the acquisition, no IOL unit employees have been required to perform their work at the Hospital's location. Only nine of the Hospital's technical employees have come to work on the IOL campus since the acquisition. Finally, the IOL employees have retained the same immediate supervisors following the acquisition. These factors demonstrate that the employees of the IOL unit share a community of interests and that the IOL unit remains an appropriate bargaining unit.
 
 
 19
 We have considered the Hospital's remaining contentions, and we find them all to be without merit.
 
 
 
 [1]
 Because we hold that the Hospital's acquisition of IOL was akin to a stock transfer, we do not reach the Board's alternative finding that the Hospital was a successor employer