BECKER, Chief Judge,
dissenting.
It is surprising that thirty-seven years after John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), in which the Supreme Court first tackled the issue of successorship liability in labor cases, the law in this area is still unsettled. Wiley established that the notion of “substantial continuity in the identity of the business enterprise” is the principal criterion for determining successorship liability, and held that, in appropriate circumstances, successor employers can be required to arbitrate with their employees’ union under the terms of the collective bargaining agreement (CBA) that the union had with the predecessor employer. Id. at 548, 551, 84 S.Ct. 909.
In NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the Court considered how the Wiley doctrine applied in different factual contexts. In American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879, 888 (3d Cir.1984), this Court used Wiley and Howard Johnson as the basis for developing a six-factored test for determining whether substantial continuity in the identity of the business enterprise is present: (i) continuity of work force, (ii) continuity of business operations, (iii) continuity of supervisory personnel, (iv) continuity of physical plant and location, (v) continuity in the nature of the product or services, and (vi) continuity in the methods of production, sales, or inventorying.
*278 As counsel for AmeriSteel had to concede at oral argument, the record in this case is crystal clear that in the transition of ownership of the York plant from Brocker Rebar to AmeriSteel, there has been not only substantial continuity but utterly no change in any of the American Bell factors except possibly for the methods of sales, which AmeriSteel’s counsel represented had changed (although he was unclear as to how and to what degree). In other words, after closure for a three-day weekend, a new business appeared at 1700 Seventh Avenue in York that was the exact same enterprise as the one that had been there four days before in virtually all respects. Despite these uncontroverted facts and their close similarity to those in Wiley, the majority holds that the successor corporation, AmeriSteel, is not bound by the arbitration provision of its predecessor’s CBA.
Judge Rendell’s thoughtful opinion makes clear that resolving this ease requires an analysis of Wiley, Bums, and Hoivard Johnson, the Supreme Court’s cases addressing when a successor can be bound to the terms of a predecessor’s CBA. Her opinion also demonstrates the difficulty of reconciling those cases and, implicitly at least, underscores the problems with choosing one path of reconciliation over another. I cannot join the majority’s opinion because I believe that the case before us is controlled by the Supreme Court’s decision in Wiley, which involved a fact pattern that is similar in all relevant aspects to the facts in the case at bar, just as the other key cases involved quite different facts. While I do not suggest that AmeriSteel is duty-bound to accept the CBA that Brocker Rebar signed with Teamsters Local 430 (the union representing Brocker’s employees), I do believe that Wiley mandates that we hold that AmeriSteel is bound to arbitrate with the union as to whether it is bound by any of the CBA’s provisions.
In other circumstances, the foregoing might well suffice for a dissenting opinion. But Wiley, Bums, and Howard Johnson are difficult to harmonize if not discordant in. their overall tone and approach, and I disagree with the majority’s attempt to fit these opinions together. I believe that the Supreme Court would do well to revisit this area which remains unclear twenty-seven years after Howard Johnson, the latest of the trilogy. Under these circumstances, I think it useful to explain my disagreement with the majority in some detail.
I.
In Wiley, a publishing firm, Interscience, entered into a CBA with a union that represented its employees. Interscience then merged with another publishing firm, John Wiley & Sons, and ceased to do business as a separate entity. The union and Wiley were unable to agree what effect the merger had on the CBA, so the union brought an action to compel arbitration under the CBA in order to determine the effect. Wiley pointed out that it did not sign the CBA, and argued that it therefore should not be bound by the CBA’s arbitration clause. The Court, however, ultimately held that “in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement.” Wiley, 376 U.S. at 548, 84 S.Ct. 909. As the majority rightly points out, Wiley also states that to send the case to arbitration (as it did), the union’s demands under the substantive terms of the CBA must not be “so plainly unreasonable that ... it can be seen in advance that no award to the Union could receive judicial sanction.” Id. at 555, 84 S.Ct. 909. Wiley nonetheless holds that “in appropriate circumstances,” a sue- *279 cessor employer can be held bound to the arbitration clause of its predecessor’s CBA, and possibly can be held bound to the substantive terms of the CBA as well — despite the fact that (like AmeriS-teel) the successor never agreed to be so bound and was not the alter ego of the predecessor.
The key question for our purposes is what are these “appropriate circumstances” in which a CBA can be enforced against a successor employer. Wiley is brief in its description of these circumstances, but it does state that there must be “relevant similarity and continuity of operation across the change in ownership” so that there is “substantial continuity of identity in the business enterprise before and after [such] a change.” Id. at 551, 84 S.Ct. 909. In Wiley, this continuity of identity and operation of the business enterprise was “adequately evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty.” Id.
The Court did not address the notion of “substantial continuity of identity in the business enterprise,” in the next case in the trilogy, Burns, because it was clear in that case that there was absolutely no continuity between the predecessor and the successor. See Burns, 406 U.S. at 286, 92 S.Ct. 1571 (“Here there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns.”). In Howard Johnson, however, the Court elaborated on that concept. In that case, the Grissom family ran a Howard Johnson’s restaurant and motor lodge and entered into a CBA with the union representing their employees. The Gris-soms thereafter sold to the Howard Johnson Company all of the personal property that they had been using to run the restaurant and lodge. By the terms of the sale agreement, Howard Johnson assumed four specific contracts relating to the operation of the restaurant and lodge but specifically declined to assume the CBA. Howard Johnson then hired its own workforce to staff the restaurant and lodge; it hired forty-five employees, only nine of whom had previously been working for the Gris-soms at the restaurant (the Grissoms had had fifty-three employees), but hired none of the Grissoms’ supervisory employees. See Howard Johnson, 417 U.S. at 250-52, 94 S.Ct. 2236.
The union filed suit, seeking an order to compel Howard Johnson to arbitrate the extent of its obligations to the former Gris-som employees under the terms of the CBA. The Court ruled against the union, holding that the substantial continuity between the predecessor and successor corporations that was present in Wiley was missing in the case before it. See id. at 264-65, 94 S.Ct. 2236. In particular, the Court noted that in Wiley the successor corporation hired all of the predecessor’s employees and did not make substantial changes in its operation of the enterprise, as Interscience’s former employees “continued to perform the same work on the same products under the same management at the same work place as before the change in the corporate employer.” Id. at 258, 94 S.Ct. 2236 (quoting Interscience Encyclopedia, Inc., 55 Lab. Arb. 210, 218 (1970) (the arbitrator’s opinion in Wiley)). In contrast, Howard Johnson selected and hired its own independent work force to run the restaurant and lodge.
The case before us involves the same sort of “substantial continuity of identity in the business enterprise” that was present in Wiley but missing in Howard Johnson. The predecessor corporation, Brocker Re-bar, negotiated a CBA with Local 430. Brocker Rebar then sold substantially all of its assets to AmeriSteel, including “the Business as a going concern and all of the *280 assets, properties, and rights of the Sellers constituting the Business or used by the Sellers therein, of every type and description, real and personal, tangible and intangible, wherever located.” Asset Purchase Agreement between AmeriSteel and Brocker Rebar at 3. The assets purchased included Brocker Rebar’s steel plant and equipment located at 1700 Seventh Avenue in York, where Local 430’s members worked, along with all of Brocker Rebar’s contracts and leases, except the CBA and individual employment contracts.
Instead of selecting and training its own work force (as the successor did in Howard Johnson), AmeriSteel hired all but six of Brocker Rebar’s former employees to work at the same plant (50 workers are needed to run the plant), doing the same jobs that they performed before the sale. AmeriSteel also hired Brocker Rebar’s top supervisory personnel at the plant (again in contrast to Howard Johnson, where the successor hired none of the predecessor’s supervisors). The York plant is situated in exactly the same location where it was before and produces the exact same product using the same inventory, the same equipment, the same physical set-up, and the same production methods that it did when it was Brocker Rebar’s plant. In short, insofar as the plant’s workers were concerned, virtually nothing changed at the plant when AmeriSteel took over except for the name on the door..
In my view, this almost total continuity in Brocker Rebar’s and AmeriSteel’s operation of the York plant brings this case under Wiley’s rule binding a successor corporation to the arbitration clause in its predecessor’s CBA when there is almost total continuity of the business enterprise. As was the case in Wiley, the employees in the case at bar “ ‘continue! ] to perform the same work on the same products under the same management at the same work place as before the change in the corporate employer.’ ” Howard Johnson, 417 U.S. at 258, 94 S.Ct. 2236 (quoting Interscience Encyclopedia, Inc., 55 Lab. Arb. at 218), Moreover, as the majority recognizes, the Supreme Court has held that the one potentially relevant difference between this case and Wiley — in Wiley the predecessor was merged into the successor, while here there was no merger but a purchase of assets — is irrelevant in the context of successor liability. See Maj. Op. at 270 n. 2; see also Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 44 n. 10, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973).
One implication of Wiley is that a successor that is bound by the arbitration clause of its predecessor’s CBA may end up being bound by (at least some of) the substantive provisions of the CBA as well. The majority is concerned that a potential problem with such a regime is that corporations may be hesitant to purchase the assets of other corporations if they thought they might be saddled with the other corporations’ labor agreements. I share that concern. However, Wiley struck a balance between corporate freedom and the protection of workers, recognizing that arbitration was an important means of maintaining labor peace and that “employees who are in fact retained in ‘[t]he transition from one corporate organization to another’ ” need to be afforded protection “from sudden changes in the terms and conditions of their employment.” Howard Johnson, 417 U.S. at 264, 94 S.Ct. 2236 (quoting and describing Wiley). The implication of the majority opinion is that Wiley is virtually a dead letter confined to its specific facts, essentially overruled. But it is not within our power to emasculate Wiley — only the Supreme Court can do that. See State Oil Co. v. *281 Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (holding that the Court of Appeals was correct to apply a Supreme Court precedent despite the precedent’s “infirmities, [and] its increasingly wobbly, moth-eaten foundations,” because “it is this Court’s prerogative alone to overrule one of its precedents”) (internal quotation marks omitted).[1]
II.
Turning to a global analysis of the majority’s decision, it is based upon the following two premises: (1) a successor corporation cannot be bound to the substantive terms of a predecessor’s CBA unless it agrees to be so bound or is an “alter ego” of the predecessor; and (2) a successor corporation that is not bound by the substantive terms of a CBA should not be bound by an arbitration provision in that CBA either, because any decision by the arbitrator enforcing the CBA could not “receive judicial sanction” and thus arbitration could “serve no purpose.” Maj. Op. at 265, 269, 273. Because it is undisputed that AmeriSteel did not agree to be bound by the CBA and there is no evidence that AmeriSteel is the alter ego of Brocker Rebar, the majority concludes that AmeriSteel cannot be bound by the arbitration provision in Brocker Rebar’s CBA with Local 430. However, a simple exercise in deductive logic reveals that premises (1) and (2) lead inexorably to the conclusion that an arbitration clause of a CBA can never be enforced against a successor corporation unless the successor agreed to be bound by the CBA or is the predecessor’s alter ego. I cannot accept the majority’s reasoning because its logical consequence flatly contradicts the holding of Wiley, see supra Part I.
Although the majority denies that it has relegated Wiley to the dustbin of history, it is abundantly clear from its opinion that it is doing just that. In order to get around the fact that Wiley’s holding is *282 implicated in the case at bar because of the very close similarity of fact patterns in this case and Wiley, the majority concludes that (1) Wiley is in “direct” and “irreconcilable conflict” with Bums because “Bums endorses the idea that unwilling successors cannot be bound” by “the substantive terms of pre-existing CBAs”; (2) Howard Johnson “downplays the significance of Wiley” while “tak[ing] an expansive view of Bums,” thus strongly reaffirming Bums while casting Wiley into doubt; so (3) Bums’s dicta rather than Wiley’s holding provides the relevant rule for this case because Bums’s dicta provides “more persuasive guidance” than Wiley’s “limited holding,” whose “status [is] not entirely clear.” Maj. Op. at 270, 271, 272, 273. I disagree with all three steps in this analysis.
A.
First, the majority’s finding of an irreconcilable conflict between Wiley and Bums depends upon its erroneous characterization of Bums as establishing “the clear mandate ... that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor.” Maj. Op. at 273. The majority relies on the following language in Bums:
These considerations, evident from the explicit language and legislative history of the labor laws, underlay the Board’s prior decisions, which until now have consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.
Burns, 406 U.S. at 284, 92 S.Ct. 1571.
When this passage is considered in its entirety, it becomes clear that this is not Bums’s holding and that to read it as establishing a “clear mandate” is a misinterpretation of Bums. As I read Bums, its holding is much more narrow, constrained by the Court’s caution that its “[rjesolution [of the case] turns to a great extent on the precise facts involved here.” Id. at 274, 92 S.Ct. 1571. Unlike in Wiley, the Court in Bums did not recite an explicit holding; rather, the Court’s actual conclusions in Bums are narrowly tailored to the particular facts of that case and carefully avoid any broad, sweeping statements of what the law is in this area. The overarching focus of the Court’s reasoning in Bums is to show that Wiley does not control in Bums’s fact situation because of the differences in the predecessor-successor relationships and in the legal claims made by the unions. See id. at 285-87, 291, 92 S.Ct. 1571 (setting out the Court’s own conclusions, which center on distinguishing Wiley). In sum, Bums does not “clear[ly] mandate ... that an unconsent-ing employer cannot be bound by the substantive terms of a CBA negotiated by it’s predecessor.” Maj. Op. at 273.
The majority further concludes that if a predecessor and successor explicitly agree that the predecessor’s CBA will not be binding on the successor, “Bums teaches that we must respect that agreement.” Maj. Op. at 273. I do not understand Bums to support this conclusion, and in fact this reading of Bums conflicts with the majority’s own characterization of the law in this area. As the majority itself observes, Wiley recognized that “an un-consenting successor” can owe an “extra-contractual duty,” grounded in “ ‘the policy of our national labor laws,’” to arbitrate with a union under the predecessor’s CBA. Maj. Op. at 268-69 (quoting Wiley, 376 U.S. at 548, 84 S.Ct. 909). It is clear that this duty, if implicated, is owed by the successor to the union, since the duty re *283 quires the successor to arbitrate with the union and the union can sue the successor to enforce the duty. However, the majority seems to believe that the successor’s extra-contractual duty to the union can be abrogated by an express contractual provision in an agreement between the successor and its predecessor, with which the union was in no way involved. See Maj. Op. at 278-74, 276-77 (“[T]he specific contractual provisions between [AmeriSteel and Brocker Rebar] did in fact not merely ‘shed’ the prior agreement containing the arbitration provisions, but contracted them away[.]”). I find no support in either Supreme Court precedent or legal reasoning for the position that an extra-contractual duty owed to an entity can be nullified by a contract to which that entity is not a party. Therefore, I believe that the provision in the AmeriSteel-Brocker Rebar sales agreement expressly repudiating the CBA is irrelevant to the analysis.
B.
The majority’s treatment of Howard Johnson is similarly flawed because it is based on the view that Hoivard Johnson “downplays the significance of Wiley,” and “takes an expansive view of Bums.” Maj. Op. at 272. On this basis, the majority implicitly holds that Bums effectively overruled Wiley. See Maj. Op. at 273 (“[W]hile the validity of Bums cannot be doubted, Bums nonetheless conflicts with the implications of Wiley.... Accordingly, we believe the clear mandate of Bums— that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor— provides more persuasive guidance than the limited holding in Wiley.”). I cannot agree with this reasoning.
The majority concedes that the centerpiece of Howard Johnson’s analysis involved applying the precepts of Wiley to the facts before the Court. See Maj. Op. at 272. I note that this is hardly consistent with the view that Howard Johnson “downplays the significance of Wiley.” Furthermore, if Bums effectively overruled Wiley, then why would Howard Johnson (decided after Bums) use Wiley’s analytical, structure to reach its decision? If the majority’s analysis is correct, then surely the Hoivard Johnson Court would have simply stated that Bums overruled Wiley and then based its decision on Bums’s “holding” that unconsenting successor employers (who are not an alter ego of the predecessor) are never bound by the substantive terms of a predecessor’s CBA. The Supreme Court has not been reluctant to overrule its own decisions when satisfied that they were wrong or based on outdated or anachronistic reasoning. See, e.g., State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Tellingly, however, Howard Johnson did not do this, but instead rested its decision upon Wiley’s analytical structure. The clear implication of this, I believe, is that the Hoivard Johnson Court did not understand Bums to have overruled Wiley. I thus cannot understand how the majority now purports to hold implicitly that Wiley is overruled.
Moreover, Howard Johnson’s description of Wiley’s holding as a “guarded, almost tentative statement,” see Maj. Op. at 272 (quoting Howard Johnson, 417 U.S. at 256) is not made in the context of downplaying the Wiley’s significance, but instead is actually a laudatory comment praising Wiley’s careful reasoning. This description of Wiley’s holding is made in the course of the Court’s observation that, in every case in this area (including Bums and Howard Johnson itself), “we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law.... [E]mphasis on the facts of each case as it arises is especially appro *284 priate.” Howard Johnson, 417 U.S. at 256, 94 S.Ct. 2236. Howard Johnson then reaffirms Burns’s statement that Burns’s decision “ ‘turnfed] to a great extent on the precise facts involved here’ ” (hardly an “expansive view” of Bums), and concludes that this sentiment applies equally well to all cases in this area of the law. Id. (quoting Burns, 406 U.S. at 274, 92 S.Ct. 1571). Howard Johnson interprets Wiley’s “guarded, almost tentative statement of its holding” as demonstrating that the Wiley Court was properly aware of the need for the Court to constrain its holding to the particular facts of the case. Id. In short, Howard Johnson does not bury Wiley, but praises it.
Finally, Howard Johnson specifically notes that its interpretation of Wiley (based on the notion of “substantial continuity of identity in the business enterprise,” see supra Part I) preserved for Wiley a substantial role in the protection of union members’ rights:
This interpretation of Wiley is consistent also with the Court’s concern with affording protection to those employees who are in fact retained in “[t]he transition from one corporate organization to another” from sudden changes in the terms and conditions of their employment, and with its belief that industrial strife would be avoided if these employees’ claims were resolved by arbitration rather than by “the relative strength ... of the contending forces.”
Id. at 264, 94 S.Ct. 2236 (quoting Wiley, 376 U.S. at 549, 84 S.Ct. 909). I think the above passage clearly communicates the Court’s intention in Howard Johnson that Wiley should continue to protect employees from “sudden changes in the terms and conditions of their employment” in situations like the one before us — where there is a change in corporate ownership but the employees and the running of the business remain overwhelmingly the same. Again, this is just not consistent with an interpretation of Howard Johnson as “downplaying] the significance of Wiley.” Maj. Op. at 272.
III.
I think that a much better reconciliation of the trilogy can be developed from a passage in Howard Johnson discussing the concept of successorship that the majority quotes early in its opinion but then promptly ignores. See Maj. Op. at 267. In this passage, Howard Johnson states that the lower court’s division of issues into (1) whether Howard Johnson was a successor employer, and (2) whether a successor is required to arbitrate under its predecessor’s CBA, was artificial and unhelpful, because “successor” is not a monolithic concept.
The question whether Howard Johnson is a “successor” is simply not meaningful in the abstract. Howard Johnson is of course a successor employer in the sense that it succeeded to operation of a restaurant and motor lodge formerly operated by the Grissoms. But the real question in each of these “successorship” cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of “successor” which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.
*285 Howard Johnson, 417 U.S. at 262 n. 9, 94 S.Ct. 2236 (emphasis added). In my view, this passage, along with Burns’s admonition that its decision “turns to a great extent on the precise facts involved here,” 406 U.S. at 274, 92 S.Ct. 1671, serves as a clear warning to lower courts not to read these opinions as providing expansive rules about successors in general; instead, the rules of these eases should always be understood in the context of the facts of the particular case. The majority appears to recognize this point when it quotes from the above passage and states that “labeling AmeriSteel a ‘successor employer’ to Brocker Rebar does little to help resolve the issue in this case.” Maj. Op. at 273. But the majority then ignores its own direction when it interprets Bums as making a general pronouncement that successors are never bound by the substantive terms of their predecessors’ CBAs, thus treating all successorship situations as legally identical.
I think the best reconciliation of the Wiley-Bums-Howurd Johnson trilogy is that the cases set out a “sliding scale” for what types of burdens can be imposed on what types of successors. That is, the successorship relationships in these three cases were very different, and the burdens imposed on the successors varied with the corresponding strength of the successor relationship, thus providing an outline for deciding future cases. In Bums, there was a very weak relationship of succession between the corporations — as the Court noted, “there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut [the predecessor] and Burns [the successor],” Burns, 406 U.S. at 286, 92 S.Ct. 1571; the successor merely took over the security job that the predecessor had performed and hired a portion of guards who,had been employed by the predecessor. In a situation with such a weak succession relationship, the Court held that the successor corporation only had the duty to bargain with the union representing the employees, and was not bound by the substantive terms of the predecessor’s CBA.
In Wiley, there was a very strong relationship of succession between the corporations — the predecessor merged into the successor — so the Court held that the successor was bound by the arbitration provision of the predecessor’s CBA, and, as the majority recognizes, implicitly recognized that the successor corporation could be bound by the substantive terms of the predecessor’s CBA as well (if the arbitrator were to so decide). The relationship of succession in Hoiuard Johnson was not as strong as in Wiley — while there was a sale of assets by the predecessor to the successor, there was not nearly as much continuity of business operations as there was in Wiley (or here) — so the Court held that the successor was not bound to arbitrate under the predecessor’s CBA.[2]
*286 The question before us, then, is which type of successor, Wiley, Bums, or Howard Johnson, is AmeriSteel most like? As I argued in Part I, I believe that AmeriS-teel is much more like a Wiley successor than a Hoioard Johnson successor. In other words, in my view there is sufficient “substantial continuity of identity in the business enterprise,” between Brocker Re-bar and AmeriSteel to justify holding that AmeriSteel is bound to the arbitration provision (and possibly to the substantive provisions) of Brocker Rebar’s CBA with Local 430. Howard Johnson, 417 U.S. at 259, 94 S.Ct. 2236 (quoting Wiley, 376 U.S. at 551, 84 S.Ct. 909).
Unfortunately, we derive no assistance from our own jurisprudence in resolving this dispute. The cases from within this circuit that interpret the Supreme Court case law can best be described as “dueling dicta”: as I describe in the margin, no Third Circuit case has issued a square holding on this issue, although several have espoused one view or the other in passing.[3]
*287 I thus agree with the majority’s conclusion that no previous Third Circuit case controls our decision in this case, see Maj. Op. at 274, and that our decision must be based on an in-depth interpretation of the Supreme Court trilogy rather on an earlier panel’s off-the-cuff musing on this issue. And because our cases are contradictory on the issue of a successor’s liabilities on a predecessor’s CBA, I cannot agree with the majority that its decision “flows logically from our existing Circuit precedent.” Maj. Op. at 274. The case law cuts both ways, so a decision on this issue must stand solely on the substance of the analysis of the Wiley-Bums-Hoiuard Johnson trilogy.
The case law from other courts of appeals also cuts in both directions, likewise noted in the margin.[4] None of the cases from other circuits that the majority cites in support of its decision engages in the detailed, in-depth analysis of the troubled trilogy that this case calls for. Additionally, none of the cases from other Circuits recognizes, as the majority does, that Wiley’s holding necessarily means that, in the right circumstances, some substantive terms of a predecessor’s CBA may be imposed on an unconsenting, non-alter-ego successor corporation. I add only that, *288 whatever the viability of the preceding proposition, this case involves only arbitrating the applicability of the CBA, and in the thirty-seven years since Wiley, one area of doctrine that has grown stronger in that period is the Supreme Court’s recognition of the importance of arbitration in a number of fields, including labor.
IV.
It is manifest from my dispute with the majority that, in its current state, the federal common law on this issue — in particular the Wiley-Bums-Howard Johnson trilogy — does not provide a clear answer in certain cases. If Wiley has been implicitly overturned by later Supreme Court cases, the Court should say so; but if, as I believe, it still plays a viable role in protecting the rights of “those employees who are in fact retained in ‘[t]he transition from one corporate organization to another’ from sudden changes in the terms and conditions of their employment,” Howard Johnson, 417 U.S. at 264, 94 S.Ct. 2236 (quoting Wiley, 376 U.S. at 549, 84 S.Ct. 909), the Court should reaffirm that fact. I hope that the Supreme Court will clarify the law in this area. In the meantime, I believe that the better interpretation of Supreme Court precedent is that the rule of Wiley is still in force and that rule should be applied to the case at bar to enforce the arbitration provision of the CBA against AmeriSteel. Indeed, if Wiley has continuing viability, its rule would apply here if it applied anywhere. I would reverse the judgment of the District Court and remand with directions to order this matter to proceed to arbitration. For the foregoing reasons, I respectfully dissent.

. The majority attempts to refine its position with the argument that the “substantial continuity” concept in Wiley "should properly be viewed as a necessary but not a sufficient condition for the imposition of arbitration on an unconsenting successor.” Maj. Op. at 269; see also Maj. Op. at 272 n. 3. It adds, “Clearly, as Wiley itself indicates, other factors must also be considered.” Maj. Op. at 272 n. 3. With all respect, I believe that this reading of Wiley conflicts with Howard Johnson’s treatment of Wiley. In Howard Johnson, the Supreme Court applied the analytical precepts of Wiley, interpreting Wiley as making “substantial continuity in the identity of the business enterprise” the centerpiece of the analysis of when a successor can be bound to arbitrate under a predecessor's CBA. The Court held in Howard Johnson that the successor corporation was not bound to arbitrate under the predecessor’s CBA because there was insufficient substantial continuity in the business enterprise, and the clear implication of the opinion is that, if there had been such substantial continuity, then the successor would have been so bound. I see nothing in Howard Johnson that would lead me to the conclusion that the Court would have held that the successor was not bound to arbitrate even if there had been such substantial continuity, because the “other factors” present in Wiley were missing there. See Howard Johnson, 417 U.S. at 264-65, 94 S.Ct. 2236 (“Since there was plainly no substantial continuity of identity in the work force hired by Howard Johnson with that of the Grissoms, and no express or implied assumption of the agreement to arbitrate, the courts below erred in compelling the Company to arbitrate the extent of its obligations to the former Grissom employees.”); see also id. at 258, 94 S.Ct. 2236 {“Even more important, in Wiley the surviving corporation hired all of the employees of the disappearing corporation.”) (emphasis added); id. at 263, 94 S.Ct. 2236 (noting that the Court's holding "is reflected in the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor in § 301 suits under Wiley").

. This approach to interpreting the trilogy has the added benefit of clarifying a cryptic piece of dicta on the successorship issue in Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). Fall River addressed the question whether Burns’s holding that a successor corporation has a duty to bargain with the union that represents the predecessor’s employees extended to a situation in which the union had been certified by the employees long before the transition in ownership. In discussing the background of the successorship doctrine, the Court said the following about Bums:
We observed in Bums that, although the successor has an obligation to bargain with the union, it "is ordinarily free to set initial terms on which it will hire the employees of a predecessor,” and it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement.
Id. at 40, 107 S.Ct. 2225 (citations omitted).
The first thing to note about this passage is that it clearly plays no part in Fall River’s *286 holding; it is simply a description of Burns contained in a general discussion of the development of successorship law, so it must be understood in that context. Although the majority contends that the statement it relies on from Fall River is only "arguably” dicta, Maj. Op. at 273, n. 5, the majority fails to explain how this statement from Fall River was necessary to the decision in that case and therefore fails to offer any argument that it is not dicta.
Some courts have interpreted this passage as standing for the proposition that a successor may never be held bound to the substantive terms of a predecessor's CBAs unless the successor consents or is the alter ego of the predecessor, see, e.g., Southward v. South Cent. Ready Mix Supply Corp., 7 F.3d 487, 493 (6th Cir.1993), and in fact the majority cites to this passage as support for its view. See Maj. Op. at 272. I think it preferable to read the passage as making an observation about Bums-lype successors particularly (i.e., these types of successors are not bound to the substantive terms of their predecessors’ CBAs), rather than a point about all successors generally, because such a reading more closely fits with the carefully circumscribed reasoning and overall approach of the Wiley-Bums-Howard Johnson trilogy. Given that the Court was so careful to limit the holdings of each case in the trilogy to "the precise facts involved here,” Howard Johnson, 417 U.S. at 256, 94 S.Ct. 2236 (quoting Burns, 406 U.S. at 274, 92 S.Ct. 1571), it would seem incongruous to read Fall River as effecting, via dicta, an expansion of the holding of one of the trilogy beyond its "precise facts” into a general rule that covers all successors in the abstract — despite Howard Johnson's clear admonition that the concept of "a 'successor' is simply not meaningful in the abstract.” Id. at 262 n. 9, 94 S.Ct. 2236. Interpreting Fall River as effecting such an expansion would do violence to the principles and approach that underlie the Wiley-Bums-Howard Johnson trilogy.

. Compare Shaffer v. Mitchell Transp., Inc., 635 F.2d 261, 266 (3d Cir.1980) ("The succes-sorship doctrine simply allows the court to imply certain contractual duties from the predecessor's collective bargaining agreement and impose them on the successor.”), Local Union No. 249 v. Bill’s Trucking, Inc., 493 F.2d 956, 960 (3d Cir.1974) ("Analysis of the Bums opinion convinces us, however, that its significance is largely limited to the particular facts of that case.... That there is no absolute bar to the enforcement of labor agreements against ‘successor’ employers in section 301 actions, such as this, is amply illustrated by the decision in John Wiley and Sons, Inc. v. Livingston.”), and Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66, 69 (3d Cir.1988) ("Burns did not deal with the question of when successorship doctrine may bind a transferee of assets to the procedural duty to submit to arbitration the question of whether the successor has somehow assumed any of the obligations of the old bargaining agreement.”), with Stardyne, Inc. v. NLRB, 41 F.3d 141, 145 n. 3 (3d Cir.1994) (stating that a "successor [is] not bound by its predecessor’s collective bargaining agreement”), NLRB v. Rockwood Energy and Mineral Corp., 942 F.2d 169, 174 (3d Cir.1991) ("[A] successor is not bound by the substantive terms of its predecessor's labor agreement.”), and United Steelworkers of Am. v. New Jersey Zinc Co., 828 F.2d 1001, 1010 (3d Cir.1987) ("[A] successor employer is not automatically re *287 quired to adopt its predecessor’s collectively bargained agreements, see NLRB v. Burns.”).

. Compare Stotter Div. of Graduate Plastics Co. v. District 65, 991 F.2d 997, 1001 (2nd Cir.1993) (holding that a successor corporation had a duty to arbitrate the extent of its obligations under its predecessor's CBA because there was substantial continuity in the business enterprise), and Boeing Co. v. Int'l Ass'n of Machinists and Aerospace Workers, 504 F.2d 307, 314-16 (5th Cir.1974) (stating that ”[w]e are confident, however, that even at the most Bums has not overruled the principles of Wiley,” which give broad protection to employees "against sudden changes in the employment relationship” by enforcing against successors the duty to arbitrate under a predecessor’s CBA), with Southward v. South Cent. Ready Mix Supply Corp., 7 F.3d 487, 493 (6th Cir.1993) (stating that Burns and Fall River support the view that a successor is not bound to the substantive terms of its predecessor's CBA).
Although the majority seeks to distinguish Stotter by the fact that the successor employer "entered into an agreement with the Union which adopted (with immaterial exceptions) the provisions of the [CBA],” Maj. Op. at 275 n. 8, it is the prior CBA (coupled with succes-sorship status), not the new CBA, that informs the ratio decidendi:
[The successor employer] asserts that it could not be made a party to the arbitration because it was not a party to the contract with the Union until May 29, 1990.... This argument essentially merges with the broader question whether the arbitrator correctly determined that GPC was a "successor” to Stotter.
In Wiley, the Supreme Court held that the surviving corporation of a merger was obliged to arbitrate disputed issues under a collective bargaining agreement between the merged (and no longer existing) corporation and the union that represented the merged corporation’s employees, even though the surviving corporation had not signed the contract and the contract did not contain an express provision binding successors.
Stotter, 991 F.2d at 1001. Stotter then undertook an extensive "substantial continuity of identity in the business enterprise” analysis, and based its decision on its finding that "such continuity clearly exists" between the predecessor and the successor. See id., see also Chartier v. 3205 Grand Concourse Corp., 100 F.Supp.2d 210, 213 (S.D.N.Y.2000) (”[T]he Supreme Court has made it clear that one who succeeds to the business of an employer that was a party to a CBA, in appropriate circumstances, may be held to have succeeded also to its obligation to arbitrate under a CBA irrespective of any intention to do so.”).
The majority also argues that Boeing is "of limited utility” because it predates Fall River. Maj. Op. at 275, n. 8. As I argue supra note 2, the language from Fall River that the majority relies on is not only dicta, but ambiguous dicta. Therefore, in this case I believe that it is Fall River that is of limited utility.